# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-0978V

| | |
|---|---|
| CARLA AMOR, | Chief Special Master Corcoran |
| Petitioner, | Filed: February 8, 2024 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Leigh Finfer,* Muller Brazil, LLP, Dresher, PA, for Petitioner.

*Mitchell Jones,* U.S. Department of Justice, Washington, DC, for Respondent.

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On August 6, 2020, Carla Amor filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a right shoulder injury related to vaccine administration ("SIRVA") resulting from an influenza ("flu") vaccine received on October 29, 2018. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

For the reasons described below, I find that the onset of Petitioner's shoulder pain occurred within 48 hours of vaccination, and that she has established all other SIRVA QAI and statutory requirements. Thus, she is entitled to compensation. Furthermore, I award

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

of damages in the amount of **$133,755.03, representing $130,000.00 for actual pain and suffering, plus $3,755.03 for past unreimbursable expenses.**

## I.     Relevant Procedural History

Over a year after the case was activated, Respondent determined he was amenable to informal resolution and the parties negotiated for several months before reaching an impasse (ECF Nos. 26-32). On August 8, 2022, Respondent filed his Rule 4(c) Report (ECF No. 33).

On December 19, 2022, Petitioner filed a motion for a ruling on the record requesting a ruling that she is entitled to compensation and seeking a pain and suffering award of $130,000.00 (ECF No. 37). On February 2, 2023, Respondent filed a response addressing entitlement but not damages (ECF No. 38). Petitioner replied on February 7, 2023 (ECF No. 39). On October 12, 2023, Petitioner filed a supplement to her motion seeking compensation for $3,755.03 in unreimbursable expenses (ECF No. 42). On December 13, 2023, Respondent filed a supplemental damages brief (ECF No. 44). The matters of whether Petitioner is entitled to compensation and, if so, how much, are now ripe for consideration.

## II.     Factual Evidence

Although I have reviewed the entire record, this decision summarizes only evidence relevant to the onset of Petitioner's symptoms, her entitlement to damages, and the amount of damages.

### A. Medical Records

On October 29, 2018, Petitioner received a flu vaccine in her right deltoid during an appointment at Riverwoods Urgent Care. Ex. 1 at 3, 4. Twenty-three days later (November 21, 2018), she saw orthopedist Dr. Kirt Kimball of Revere Health complaining that a recent flu shot had hurt her arm, and that the pain persisted. Ex. 2 at 69. She stated that the onset of her symptoms occurred on October 29th, and noted the mechanism of injury as "flu shot." *Id.* at 174. On examination, she had guarding with internal rotation, positive impingement signs, and findings consistent with subacromial bursitis. *Id.* at 69-70. The record documents full range of motion ("ROM") in her *left* shoulder, but does not address her ROM in her injured *right* shoulder. *Id.* X-rays were normal. Dr. Kimball assessed Petitioner with right shoulder subacromial bursitis and osteophyte on the dorsal aspect of the acromioclavicular joint, and administered a cortisone injection. *Id.* at 70.

Less than three months later (February 13, 2019), Petitioner returned to Dr. Kimball, stating that the cortisone injection had resolved her pain, but that she had aggravated her shoulder doing push-ups about three or four weeks earlier. Ex. 2 at 60.

2

She had difficulty doing planks and other upper body conditioning. *Id.* On examination, her right shoulder passive forward flexion was 170 degrees, and she had guarding with internal rotation and pain with resisted abduction and external rotation. *Id.* Dr. Kimball administered another cortisone injection in her right shoulder and planned to order an MRI if she was not better at the next visit. *Id.* at 61.

Five months later (July 15, 2019), Petitioner saw Dr. Kimball for early onset osteoarthritis with multiple joint involvement. Ex. 2 at 59. She reported problems with her right shoulder and both knees, and that her shoulder was having difficulty with certain movements. *Id.* at 172. Dr. Kimball prescribed a Medrol dose pack. *Id.* at 59. The next month (August 14, 2019), Petitioner saw Dr. Kimball for right knee pain and right shoulder pain. *Id.* at 52. Her right shoulder continued to be painful both at rest and when active. *Id.* Her shoulder pain had responded well to cortisone in the past and she requested another cortisone shot, which was given. *Id.* at 52-53.

Petitioner returned to Dr. Kimball for right shoulder pain four months later, on December 30, 2019. Ex. 2 at 47. Dr. Kimball gave her a subacromial steroid injection and planned an MRI. *Id.* Petitioner had a right shoulder MRI for "[r]ight shoulder pain after flu shot several months ago" on April 6, 2020. *Id.* at 40. The MRI showed a low to moderate grade tear of the infraspinatus tendon, moderate tendinosis of the supraspinatus and infraspinatus tendons, mild subacromial/subdeltoid bursitis, and mild acromioclavicular joint arthritis. *Id.*

Petitioner saw Dr. Kimball to review the MRI on April 15, 2020. Ex. 2 at 37. She stated that the pain was getting worse, rating it as six out of ten, and requested another steroid injection for the pain, which was given. *Id.* at 37-38. Two months later (June 16, 2020), Dr. Kimball performed arthroscopic surgery with debridement, decompression, evacuation of calcium deposits, and partial distal claviculectomy on Petitioner's right shoulder. Ex. 3 at 7-9. At Petitioner's first post operative visit on June 25, 2020, she was making progress and tolerating her pain well. *Id.* at 12. Dr. Kimball taught her some home exercises and recommended formal physical therapy to improve her ROM and strength. *Id.* at 14.

Petitioner underwent a PT evaluation of her right shoulder on June 26, 2020. Ex. 6 at 6. She stated that she had experienced right shoulder pain since 2018 and that cortisone injections were no longer helping as they once did, resulting in surgery. *Id.* She rated her pain between zero to seven out of ten, which the therapist noted as typical postoperative pain. *Id.* She also complained of stiffness, swelling, and weakness of her right shoulder. *Id.* On examination, her right shoulder was mildly tender to palpation with minimal swelling. *Id.* Her passive ROM was 110 degrees in flexion, 100 degrees in

abduction, and 40 degrees in external rotation.[3] *Id.* Her right shoulder strength was three out of five with all movements, and her functional ability was evaluated as being limited approximately 70% due to postoperative pain, weakness, and limited ROM, compromising her activities of daily living. *Id.* A treatment plan of three sessions a week was established. *Id.* at 7.

Petitioner attended seven more PT sessions until her discharge on August 11, 2020. Ex. 6. at 8-14. At discharge, she was noted to have made excellent progress, with significantly decreased pain since the start of PT. *Id.* at 14. She was pain free most of the time, with pain ranging from zero to three out of ten. *Id.* Her passive ROM had improved to 170 degrees in flexion, 180 degrees in abduction, and 85 degrees in external rotation, and her strength had improved to four out of five. *Id.* Her right shoulder function remained limited approximately 20% due to lingering pain, weakness, and stiffness. *Id.* She was advised to continue her home exercise program to alleviate the remaining minor deficits. *Id.*

### B. Affidavit and Declaration

Petitioner submitted an affidavit and declaration in support of her claim. Exs. 5, 8. Petitioner states that she experienced "immediate, sharp pain" after the October 2018 flu vaccination, "unlike any previous vaccine I received in the past. Ex. 8 at ¶ 2. She assumed the pain would resolve, but it continued in varying intensity. *Id.* at ¶ 3. By November 1, 2018, she was in so much pain that she called Riverwoods Urgent Care, and was told that her vaccine was placed in her deltoid muscle as it should have been. *Id.* at ¶ 4.

She lived with the pain and compensated with her left arm. Ex. 8 at ¶ 5. She recalled that she made lemon squares for her stepdaughter's baby shower on November 17, 2018, and in trying to cut them she experienced such severe pain that her sister noticed and took over. *Id.* at ¶ 6. This incident prompted her to call Dr. Kimball and schedule an appointment. *Id.*

### C. Unsworn and Undated Impact Statement

Petitioner submitted an unsworn, unsigned, and undated[4] three page document labeled on CM/ECF as an "Impact Statement." Ex. 17. It was filed on October 12, 2023 and is titled "Carla Amor SIRVA," and for purposes of this ruling I assume it was written by Petitioner.

---

[3] Normal shoulder ROM for adults ranges from 165 to 180 degrees in flexion, 170 to 180 degrees in abduction, and 90 to 100 degrees in external rotation. Cynthia C. Norkin and D. Joyce White, MEASUREMENT OF JOINT MOTION: A GUIDE TO GONIOMETRY 72, 80, 88 (F. A. Davis Co., 5th ed. 2016).

[4] Much of the statement is consistent with other evidence. However, I do not place substantial weight on it due to the noted deficiencies.

Petitioner states that when she received the flu shot in October 2018, it seemed to be placed higher than normal, and she immediately had "more pain." Ex. 17 at 1. She ignored it at first, but it got worse, especially at about two or three days. *Id.* She called the urgent care office where she received the vaccine, and was told that pain can be normal for a while. *Id.*

Petitioner recalls pain and difficulty with picking up her grandkids, sleeping, dressing, undressing, drying off after a shower, or simply pulling up jeans. Ex. 17 at 1. Cortisone injections helped relieve the pain and improve her ROM for a month or two, but also caused about a week of redness and increased blood pressure, and the pain always returned, usually after two months. *Id.* at 1-2. Her shoulder injury made painting, remodeling, sewing, gardening, and lawn work difficult. *Id.* at 2. Her injury impaired her ability to do core exercises that helped with longstanding back pain, resulting in worsening back pain. *Id.*

Her experience after surgery was "pretty rough," but her shoulder is now much better, although it took much longer than she expected. Ex. 17 at 3. She had to discontinue PT earlier than planned due to her son's illness. *Id.* She is now able to rake leaves and throw balls, although afterward her shoulder is a bit sore. *Id.* At this point, her pain is never more than three out of ten, and she can sleep on her shoulder. *Id.*

### III.     Factual Findings and Ruling on Entitlement
#### A. Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[5] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

---

[5] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. Section 11(c)(1)(A)(B)(D)(E).

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

### B. Parties' Arguments

Petitioner argues that she is not obligated to establish that she visited a medical provider within 48 hours of vaccination, or specify the date of vaccination when seeking care, in order to establish that the onset occurred within 48 hours. Petitioner's Motion for a Ruling on the Record Regarding Entitlement and Damages, filed Dec. 19, 2022, at *5-6 (ECF No. 37) ("Mot."). In this case, when Petitioner sought care for her injury from Dr. Kimball on November 21, 2018, she reported pain from a recent flu shot that had not gone away. Mot. at *6 (*citing* Ex. 2 at 69). The record listed the flu shot as the mechanism of injury, and Petitioner filed a declaration asserting that she experienced pain immediately. *Id.* (*citing* Ex. 2 at 174, Ex. 8). Petitioner argues that when she reported her pain, she used language similar to that found to support onset within 48 hours in *Williams v. Sec'y of Health & Human Servs.*, No. 17-1046V, 2020 WL 3579763, at *5 (Fed. Cl. Spec. Mstr. Apr. 1, 2020).

Respondent argues that Petitioner has not established that the onset of her shoulder pain occurred within 48 hours of vaccination because she "had no documented visits to a medical provider within the forty-eight hours of her flu vaccination that would support her claim." Respondent's Response to Petitioner's Motion for a Ruling on the

Record, filed Feb. 2, 2023, at *4 (ECF No. 38) ("Resp.").[6] When Petitioner first reported right shoulder pain just over three weeks after vaccination, she "did not specifically identify pain within forty-eight hours" nor did any of her other records do so. Resp. at *4 (*citing* Ex. 2 at 69). Petitioner's declaration testimony that she reached out to the vaccine administrator within a few days "is unsupported by any record evidence." *Id.* (*citing* Ex. 8). And Petitioner's statement that she experienced immediate pain "is inconsistent with the more vague language describing onset in her contemporaneous medical records." *Id.* at *4-5.

Petitioner reiterates on reply her contention that she "is under no obligation to visit a medical provider within the forty-eight hour post-vaccination period, nor is she even required to know the exact date of her vaccination when reporting the onset of her pain." Petitioner's Reply, filed Feb. 7, 2023, at *2 (ECF No. 39) ("Reply"). Petitioner emphasizes that her first treatment record effectively characterizes the onset as immediate and that her medical records "make it very clear that the onset of Petitioner's right shoulder pain occurred within the requisite time period" for a Table SIRVA. Reply at *2. Additionally, Petitioner's treating physician noted her injury as "appear[ing] to have been precipitated by a flu shot." *Id.* at *2-3 (*citing* Ex. 2 at 47).

### C. Onset

After reviewing the record, I find that a preponderance of the evidence supports a finding that the onset of Petitioner's right shoulder pain occurred within 48 hours of her flu vaccination. There are multiple records supporting onset within 48 hours, and none that would suggest a later onset.

Contrary to Respondent's suggestion, there is no requirement that a petitioner *seek* formal medical care within 48 hours of vaccination in order to establish SIRVA onset. *See Brennan v. Sec'y of Health & Human Servs.*, No. 20-1844V, 2023 WL 7162365, at *7 (Fed. Cl. Spec. Mstr. Sept. 13, 2023) (requirement that Petitioner establish onset of pain within 48 hours "does *not* mean that a petitioner must be able to cite to a medical record *created* within the first 48 hours after vaccination") (emphases in original); *Wilkinson v. Sec'y of Health & Human Servs.*, No. 19-0733V, 2022 WL 444451, at *4 (Fed. Cl. Spec. Mstr. Jan. 14, 2022) (noting that the Vaccine Act does not require a petitioner to obtain medical care within 48 hours of vaccination); *Niemi v. Sec'y of Health & Human Servs.*, No. 19-1535V, 2021 WL 4146940, at *4 (Fed. Cl. Spec. Mstr. Aug. 10, 2021) ("the Vaccine Act clearly does *not* require that symptoms be recorded within a specific timeframe to be preponderantly established. Rather, it requires only that onset *occurs* in the relevant timeframe") (emphases in original).

---

[6] Respondent also asserts that Petitioner must show that she suffered the residual effects of her injury for more than six months (Resp. at *3), but does not elaborate or argue that Petitioner has not met this requirement.

While evidence of a medical visit for shoulder pain within two days of vaccination would be highly relevant to the question of onset, in my experience it is much more common for petitioners in SIRVA cases to delay seeking formal medical care for weeks, or even months, in hopes that the pain will resolve without treatment. *See Winkle v. Sec'y of Health & Human Servs.*, No. 20-0485V, 2021 WL 2808993, at *4 (Fed. Cl. Spec. Mstr. June 3, 2021) ("[i]t is common for a SIRVA petitioner to delay treatment, thinking his/her injury will resolve on its own" and finding onset was within 48 hours when the petitioner did not seek care until five months after vaccination).

When Petitioner first sought care for her injury 23 days after vaccination, she stated that a recent flu shot had hurt her arm, and that the pain had persisted. Ex. 2 at 69. She reported that the onset of her symptoms was on October 29, 2018 –the date she received the flu vaccine – and the mechanism of injury was noted as "flu shot." *Id.* at 174. Later, her treating physician deemed her injury as "appear[ing] to have been precipitated by a flu shot" and "appear[ing] to be attributable to a flu shot." *Id.* at 47. And Petitioner has stated that she experienced "immediate sharp pain," unlike previous experiences, after vaccination. Ex. 8 at ¶ 3. This is strong evidence suggesting immediate onset.

I do not agree with Respondent that Petitioner's declaration testimony is inconsistent with her medical records. Those records document the onset of her symptoms as being the date of vaccination. She reported that a flu shot injured her arm and the pain had persisted. This is consistent with her declaration stating that her pain was immediate.

### D. Other SIRVA QAI Criteria

Respondent does not contest the remaining SIRVA QAI criteria, and I find that the record contains preponderant evidence that they are satisfied. Petitioner did not have a history of right arm pain or injury prior to vaccination that would explain her symptoms after vaccination. *See* Ex. 1. Her pain and reduced ROM were limited to her right. shoulder, where the flu vaccine was administered, and no other condition or abnormality has been identified that would explain her post-vaccination symptoms. *See* Exs. 2, 3, 6.

### E. Other Requirements for Entitlement

The record contains preponderant evidence that other requirements for entitlement are satisfied as well. Petitioner received a covered vaccine in the United States. Ex. 1 at 3-4. She experienced the residual effects of her condition for more than six months. Ex. 2 at 52. She averred that neither she, nor any other party, has ever received an award or settlement for her vaccine-related injury or filed a civil action. Ex. 5.

### F. Entitlement

I find that Petitioner has established by a preponderance of the evidence that all of the Table SIRVA and QAI requirements are established. Further, she has established all statutory requirements for entitlement. Thus, Petitioner is entitled to compensation.

## IV. Damages

### A. Legal Standards

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my

10

predecessor Chief Special Masters) adjudicating similar claims.[7] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Human Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The *Graves* court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

### B. Prior SIRVA Compensation Within SPU[8]

#### 1. Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2024, 3,696 SPU SIRVA cases have resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 3,588 of these cases, with the remaining 108 cases dismissed.

2,075 of the compensated SPU SIRVA cases were the result of a reasoned ruling that petitioner was entitled to compensation (as opposed to an informal settlement or concession).[9] In only 200 of these cases, however, was the amount of damages *also*

---

[7] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

[8] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[9] The remaining 1,513 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

determined by a special master in a reasoned decision.[10] As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[11]

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[12] Agreement** |
|---|---|---|---|---|
| **Total Cases** | *200* | *1,846* | *29* | *1,513* |
| **Lowest** | $40,757.91 | $10,000.00 | $45,000.00 | $2,500.00 |
| **1st Quartile** | $70,000.00 | $61,338.13 | $90,000.00 | $36,000.00 |
| **Median** | **$88,974.23** | **$81,049.85** | **$130,000.00** | **$53,500.00** |
| **3rd Quartile** | $125,007.45 | $110,000.00 | $162,500.00 | $80,000.00 |
| **Largest** | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### 2.    Pain and Suffering Awards in Reasoned Decisions

In the 200 SPU SIRVA cases in which damages were the result of a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $40,000.00 to $210,000.00, with $85,000.00 as the median amount. Only nine of these

---

[10] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (1,846 cases) or stipulation (29 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

[11] Of course, even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Human Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[12] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[13]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In eight cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

### C. Parties' Arguments

Petitioner seeks an award of $130,000.00 for pain and suffering. Mot. at *6. In support of her claimed award, Petitioner cites *Blanco* and *Gunter*, with pain and suffering awards of $135,000.00 and $125,000.00, respectively.[14] *Id.* at *7-8.

Petitioner argues that she sought treatment quickly after vaccination, and consistently reported pain levels of six or seven out of ten. Mot. at *8. She underwent several diagnostic examinations, including an MRI, received five cortisone injections, and later underwent surgery approximately 18 months after vaccination. *Id.* After surgery, she engaged in a round of post-operative PT. *Id.* at *9. Petitioner adds that her decision to

---

[13] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

[14] *Blanco v. Sec'y of Health & Human Servs.*, No. 18-1361V, 2020 WL 4523473 (Fed. Cl. Spec. Mstr. July 6, 2020); *Gunter v. Sec'y of Health & Human Servs.*, No. 17-1941V, 2020 WL 6622141.

continue with a home exercise program rather than in person formal PT was largely due to her minor son's medical condition and treatment. *Id.* She argues that her overall treatment course and experience are similar to *Blanco* and *Gunter*. *Id.* Although Petitioner's pain levels were slightly lower and she completed less PT, she had more cortisone injections. *Id.* Petitioner also argues that *Gunter* is distinguishable due to a treatment gap. *Id.*

Respondent proposes an award of no more than $112,500.00 in pain and suffering. Respondent's Supplemental Damages Brief, filed Dec. 13, 2023, at *6 (ECF No. 44) ("Supp."). Respondent cites *Selling* and *Cates*, in which awards of $105,000.00 and $108,000.00, respectively, were issued, as good comparable cases.[15] Supp. at *8-9. In Respondent's view, Petitioner's injury was comparatively mild and limited, with six orthopedic visits, one MRI, one Medrol dose pack prescriptions, 14 PT sessions, five steroid injections, and one surgery. Supp. at *6. Respondent also emphasizes that there were multiple gaps in Petitioner's presentation and treatment, and that she appeared to be mostly pain free by August 2020. *Id.* And she had co-morbidities that likely contributed to her pain, including arthritic symptoms in multiple joints. *Id.*

Petitioner's comparable cases are not good matches for the present circumstances, in Respondent's view. The *Blanco* petitioner, for example, sought treatment for nearly two years, almost six months longer than Petitioner, without meaningful gaps, and had a "more severe" treatment course in that it required more expansive treatment including massage therapy and acupuncture. Supp. at *7. And the *Gunter* petitioner had no co-morbidities that contributed to her pain, unlike Petitioner. *Id.* at *7-8. Instead, this case is "overall roughly comparable" to *Selling*, since that claimant received "multiple" steroid injections, 18 PT sessions, shoulder manipulation under anesthesia, and psychological treatment. Supp. at *8. Respondent argues that the *Cates* petitioner attended nine occupational therapy sessions, 19 PT sessions, and underwent surgical intervention. *Id.* at *8. Thus, in Respondent's view, both the *Selling* and *Cates* petitioners involved "only a handful of office visits and surgical intervention," with the *Cates* petitioner attending slightly more PT/occupational therapy sessions and also being affected professionally. *Id.* Respondent asserts these cases are comparable to this case in many respects. *Id.* at *8-9.

### D. Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

---

[15] *Selling v. Sec'y of Health & Human Servs.*, No. 16-588V, 2019 WL 3425224 (Fed. Cl. Spec. Mstr. May 2, 2019); *Cates v. Sec'y of Health & Human Servs.*, No. 18-0277V, 2020 WL 3751072 (Fed. Cl. Spec. Mstr. June 5, 2020).

When performing this analysis, I review the record as a whole to include the medical records and affidavits filed and all assertions made by the parties in written documents. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

Of the cases by the parties, the closest is *Gunter*. Both Ms. Amor and the *Gunter* petitioner first sought care close to one month after vaccination, with Ms. Amor seeking care sooner, and both underwent surgery. Although Ms. Amor had less PT, she received significantly more steroid injections (five compared to two). And while the overall duration of their injuries is similar, the *Gunter* petitioner had a 13-month treatment gap, whereas Ms. Amor had multiple short treatment gaps of two to five months after cortisone injections, but no longer gaps, suggesting that Ms. Amor's injury persisted to a greater degree. While Ms. Amor obtained good pain relief from cortisone injections, it was not lasting and ultimately she underwent surgery.

*Selling* and *Cates* are not comparable. In *Cates*, the petitioner underwent surgery within two months of vaccination, and treated for only seven months, compared to over 21 months for Ms. Amor. The *Cates* petitioner had one cortisone injection, while Ms. Amor had five. In *Selling*, the petitioner underwent a manipulation under anesthesia, compared to the arthroscopic surgery with debridement, decompression, evacuation of calcium deposits, and partial claviculectomy that Ms. Amor had. As noted in *Selling*, while manipulation requires general anesthesia, suggesting great pain, it is not invasive in the way that arthroscopic surgery is. *Selling*, 2019 WL 3425224, at *6. While Respondent is correct that Petitioner *had* co-morbidities, he has not established that they *contributed to* her pain as he argues.

This case has similarities to *Blanco* in that both petitioners underwent surgery and had multiple cortisone injections (four in *Blanco*, five in this case). But the *Blanco* petitioner's injury was more severe. Prior to surgery, the petitioner in *Blanco* "frequently reported a pain level of eight out of ten." *Blanco*, 2020 WL 4523473, at *3. Her injury continued for over two years, longer than Ms. Amor's, and at Ms. Blanco's discharge from PT, she had a residual pain level of two out of ten. *Id*.

Having fully reviewed the record and the cases cited by the parties, I determine that Petitioner's award should be slightly higher than that in *Gunter*, and I therefore award $130,000.00 for pain and suffering.

### E. Unreimbursable Expenses

Initially, Petitioner requested $3,994.82 in unreimbursable expenses. Mot. at *6. Petitioner later modified this request to $3,755.03. Petitioner's Supplement to Motion for a Ruling on the Record, filed Oct. 12, 2023, at *2 (ECF No. 42). Respondent recommends an award of $3,994.82 in unreimbursable expenses. Respondent's Supplemental

15

Damages Brief, filed Dec. 13, 2023, at *9 (ECF No. 44). I determine that Petitioner should be awarded $3,755.03 in unreimbursable expenses.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that Petitioner's right shoulder injury meets the definition for a Table SIRVA, and that Petitioner is entitled to compensation in this case. Furthermore, I find that $130,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[16] I also find that Petitioner is entitled to $3,755.03 in actual unreimbursable expenses. Petitioner's motion for a ruling on the record is GRANTED.**

**Therefore, I award Petitioner a lump sum payment of $133,755.03 in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[17]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[16] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[17] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.